## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **JAMIE CARROLL**, | : |
| 13720 Atlantis Street #218, | : |
| Herndon, VA 20171 | : |
| | : |
| Plaintiff, | : |
| v. | :     Case No.: |
| | : |
| **AMAZON DATA SERVICES, INC.**, | : |
| 100 Shockoe Slip Fl 2, | : |
| Richmond, VA 23219 – 4100 | : |
| | : |
| | : |
| Defendant. | : |
| | : |

## COMPLAINT
### (Jury Trial Demanded)

Plaintiff, Jamie "Jasmine" Carroll ("Plaintiff"), by and through counsel, files this Complaint and demand for jury against Defendant, Amazon Data Services, Inc. ("Defendant" or "Amazon"), and for cause alleges the following:

## PARTIES

1.      Plaintiff was and is at all times during this Complaint an adult resident citizen of Virginia, residing at 13720 Atlantis Street #218, Herndon, VA 20171.

2.      Defendant, Amazon Data Services, Inc., is a corporation operating out of 12900 Worldgate Drive, Herndon, VA 20170.

## JURISDICTION AND VENUE

3.      This case is brought pursuant to Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 U.S.C. § 20003-16 et. seq., to obtain relief for discrimination,

retaliation and hostile work environment on the basis of Plaintiff's race in violation of said provision.

4.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because Defendant operates in this judicial district and has sufficient contacts for personal jurisdiction pursuant to 29 U.S.C. § 2615. This is also the judicial district where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## ADMINISTRATIVE PROCEDURE

5.      Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

6.      The EEOC thereafter conducted an investigation of Plaintiff's claim and thereafter provided Plaintiff with a Notice of Right to Sue on July 21, 2021.

7.      This Complaint is being filed within ninety (90) days of the Plaintiff's receipt of the Notice of Right to Sue.

## STATEMENT OF FACTS

8.      Plaintiff is an African American female.

9.      Plaintiff was employed by Defendant from October 2018 to September 2020 as a Rack Decom Datatech technician in Defendant's Herndon, Virginia location.

10.      During the course of Plaintiff's employment with Defendant, Plaintiff satisfactorily performed the duties and responsibilities required to be performed pursuant to the terms of her employment.

a)  _**Plaintiff is Written up for Engaging in Protected Activity for the First Time**_

11.     In and around September of 2019, Plaintiff, in a meeting with Amber Klimczyk ("Ms. Klimczyk"), Human Resources Business Partner ("HRBP") for Defendant, complained about discrimination on the basis of sex and race.

12.     Plaintiff complained that Sean Sandberg ("Mr. Sandberg") and Josh Clarke's ("Mr. Clarke"), Decom Managers for Amazon, refusal to allow Plaintiff to participate in special IT projects and travel was discriminatory on the basis of race and sex.

13.     Unlike Plaintiff, Mr. Sandberg and Mr. Clark had approved, Ryan Hughes, Ryan Wetherhold, Shane Reynolds, and Christian Troth, Plaintiff's similarly situated Caucasian male team members for travel and special IT projects that would help build their promotion documentation.

14.     Mr. Sandberg and Mr. Clarke stated that Plaintiff was ineligible for these opportunities as she was underperforming in her position. Specifically, Mr. Sandberg and Mr. Clarke contended that Plaintiff was tardy in her attendance and had not decommissioned enough racks.

15.     Mr. Sandberg and Mr. Clarke's justifications that Plaintiff was ineligible for these opportunities as she was under performing were unfounded as Ryan Hughes ("Mr. Hughes"), Plaintiff's Caucasian male team member, had numerous instances of tardiness and had also been criticized for not decommissioning enough racks. In spite of such, Mr. Sandberg and Mr. Clarke permitted Mr. Hughes travel opportunities and special IT assignments.

16.     Instead of addressing Plaintiff's complaints in their meeting, Ms. Klimczyk informed Plaintiff that she would be issuing Plaintiff a final written warning for being late.

17.     Ms. Klimczyk's final warning included no information as to the dates and times Plaintiff was late. It was later determined that Plaintiff had arrived to work well within Defendant's 15-minute grace-period for each of the dates Ms. Klimczyk alleged Plaintiff had been tardy.

18.     Generally, prior to being placed on a final written warning employees meet with their managers in a 1-on-1 to address their performance deficiencies. Thereafter, should no improvement be noted, employees are given a first written warning. Should no improvement continue thereafter, employees are given a final warning before being placed into Defendant's Pivot program.

19.     Plaintiff received no counseling, 1-on-1, or first written warning prior to being given a final warning.

20.     Despite complaining to Ms. Klimczyk regarding Mr. Sandberg and Mr. Clarke's disparate treatment, Ms. Klimczyk did not investigate Plaintiff's concerns nor do anything to stop Mr. Sandberg and Mr. Clarke from discriminating against Plaintiff.

### b)  _**Defendant permits the harassment of Plaintiff**_

21.     On or around October 9, 2019, Plaintiff complained to Mr. Sandberg about Danny Alfred ("Mr. Alfred"), a Rack Decom Datatech for Defendant, continuously touching her hair even after being asked by Plaintiff to stop.

22.     Plaintiff also complained to Dave McMahon ("Mr. McMahon"), Mr. Alfred's Decom Manager, regarding Mr. Alfred's conduct.

23.     Mr. Sandberg and Mr. McMahon did nothing to address Plaintiff's complaints regarding Mr. Alfred.

24.     On January 24, 2020, Plaintiff learned she was scheduled to work with Mr. Alfred, Nashidaa Aseel and Luis Herrera on February 5, 2020.

4

25.     On January 24, 2020, Plaintiff, through email, escalated her complaint regarding Mr. Alfred's conduct to Ms. Klimczyck and expressing her discomfort in working with Mr. Alfred.

26.     On February 5, 2020, given Plaintiff had not heard back from Ms. Klimczyck regarding her January 24, 2020 email complaining about Mr. Alfred's conduct, Plaintiff requested to leave work early this day.

27.     Then, in and around May of 2020, Defendant placed Plaintiff on a Pivot alleging that Plaintiff refused to work with her co-workers on February 5, 2020. Defendant incorporated this critique in Plaintiff's Pivot in spite of having ignored Plaintiff's prior pleas to Defendant's Management and Human Resources regarding her apprehension in working with Mr. Alfred given Mr. Alfred's continued harassment towards Plaintiff which had gone by unmediated and uninvestigated for several months by Mr. Sandberg, Mr. McMahon and Ms. Klimczyck.

c)   *Plaintiff's Request for Transfer*

28.     In and around November 2019, Plaintiff requested and was approved by Symphonee Lindsey, Amazon's Senior Human Resources Manager, to transfer away from Mr. Sandberg and Mr. Clarke's management. Plaintiff's reason for the transfer was due to the disparate treatment of Plaintiff in comparison to her Caucasian male counterparts by Mr. Sandberg and Mr. Clarke.

29.     On November 26, 2019, Plaintiff began working for Dave McMahon ("Mr. McMahon"), a Rack Decom Manager for Defendant.

30.     After joining Mr. McMahon's team, Mr. McMahon informed Plaintiff that should she continue to complain of racial discrimination or disparate treatment, she would be terminated.

31.     On a weekly basis following Plaintiff's transfer to Mr. McMahon's team, Ms. Klimczyk would call Mr. McMahon to inquire about Plaintiff's performance.

5

32.     During the time Plaintiff worked with Mr. McMahon, Plaintiff performed her job duties at an equal or superior level to her white male counterparts.

33.     Despite performing her job duties at an equal or superior level to her white male counterparts, Plaintiff was denied a pay raise.

34.     Mr. McMahon stated that the reason he refused to grant Plaintiff a pay increase was because she had been given a prior final written warning by her previous manager, Mr. Sandberg, for underperforming in her role. Mr. Sandberg had alleged that Plaintiff had not decommissioned enough racks and had been late to work.

35.     Mr. McMahon also contended that the reason he denied Plaintiff a pay increase was given Plaintiff was underperforming in her role on his team. Despite this contention, Mr. McMahon was unable to provide Plaintiff with explanation regarding what areas she was allegedly deficient in and required improvement.

36.     Unlike Plaintiff, Plaintiff's white male counterparts, Ryan Hughes and Chris Wills, still received a pay increase from Mr. McMahon despite decommissioning far less racks than Plaintiff and in spite of having numerous instances of tardiness in reporting to work.

37.     Following Mr. McMahon's denial of Plaintiff's pay raise, Plaintiff learned that Mr. McMahon had notified other members on their team that Plaintiff would be "terminated within the next couple of months."

38.     Plaintiff reported Mr. McMahon's desperate treatment of Plaintiff to Ms. Klimczyk. Ms. Klimczyk again conducted no investigation nor did anything to stop Mr. McMahon from discriminating against Plaintiff.

### d) *Plaintiff is Improperly Placed on a Pivot*

39.     In and around May 18, 2020, Plaintiff received a Pivot document from Defendant for alleged tardiness and refusing to work with other co-workers.

40.     Prior to being placed on a Pivot, an employee is to receive coaching and feedback regarding their performance.

41.     Under the Pivot program, Defendant's managers can elect to enter an employee into Pivot where an employee has continued to underperform in the expectations of his/her role after coaching and feedback.

42.     Pivot is a program for Level 4-7 employees.

43.     The Pivot program provides employees with options to (1) improve performance by being placed on a performance improvement plan ("PIP") or (2) voluntarily leave Amazon with Pivot severance.

44.     At the time Plaintiff was placed in Pivot, Plaintiff was a Level 3 technician.

45.     Prior to being placed in the Pivot program, Plaintiff did not receive any prior counseling or first warning as required by Amazon's policies on progressive discipline. Instead, following Ms. Klimczyck's improper issuance of a final warning to Plaintiff in November of 2019, Plaintiff was immediately entered into the Pivot program.

46.     After receipt of the Pivot, Plaintiff appealed the findings of the document arguing that Mr. McMahon's statements in the Pivot as to Plaintiff's alleged deficiencies were false.

47.     On Appeal, Defendant admitted that the statements written by Mr. McMahon in Plaintiff's May 2020 Pivot were indeed inaccurate and unsubstantiated.

48.     Unlike Plaintiff, Plaintiff's white male counterparts, Ryan Hughes and Chris Wills, were never placed on a PIP despite decommissioning far less racks than Plaintiff and in spite of their continued tardiness.

### e)  *Plaintiff is Written up for Engaging in Protected Activity for the Second Time*

49.     In and around August 3, 2020, Defendant wrote Plaintiff up for reporting the discrimination of Ms. Klimczyk and Mr. McMahon to Defendant's upper management.

50.     Plaintiff had reported to Defendant that Mr. McMahon displayed favoritism towards her white male counterparts and shared that Ms. Klimczyk had routinely failed to investigate Plaintiff's previous complaints of discrimination and harassment.

51.     In response, Defendant and its agents issued Plaintiff a written warning advising that Plaintiff's complaints of discrimination regarding her managers and HR personnel were "abusive and harassing."

52.     Defendant's response to Plaintiff further outlined that should Plaintiff continue to complain of discrimination in the workplace that such could subject her to further "action up to and including termination of employment."

### f)  *Plaintiff is Subjected to Higher Performance Standards than her Peers*

53.     Throughout the course of Plaintiff's employment at Amazon, Defendant's managers subjected Plaintiff to higher performance standards than her white male peers.

### i.  *Mr. McMahon's Disparate Treatment Towards Plaintiff: Lunch Breaks*

54.     In and around August 13, 2020, Mr. McMahon reprimanded Plaintiff for taking her lunch break at 11 a.m.

55.     Mr. McMahon cited that Plaintiff was to coordinate with her team members regarding her lunch break.

56.     Amazon however has no policy requiring team members to jointly agree on when the team as a whole should break for lunch.

57.     Mr. McMahon never instructed Plaintiff's Caucasian male counterparts against taking lunch at 11 nor required such to coordinate with other team members prior to taking lunch.

*ii.*      ***Mr. McMahon Singles out Plaintiff***

58.     On or around August 14, 2020, Mr. McMahon failed to notify Plaintiff that Amazon had updated its policy regarding employee's use of personal protective equipment ("PPE").

59.     Amazon's policy stated that any employee not wearing PPE would be given a write up and could be subject to termination if caught in violation of the policy.

60.     Having not received Mr. McMahon's notice regarding Defendant's updated policy regarding PPE, Plaintiff presented to work on August 14, 2020 without wearing her bump cap or safety glasses and was subject to counseling.

*iii.*     ***Plaintiff was Routinely Criticized by Mr. McMahon for her Afro-Textured Hair***

61.     Plaintiff would style her afro-textured hair in a manner that permitted her bump cap to fit securely on her head.

62.     Nonetheless, from the time Plaintiff first transferred to Mr. McMahon's team, Mr. McMahon would constantly critique Plaintiff's hair encouraging her to either cut her hair or consider treating her hair so that she could "wear her bump cap properly."

63.     Mr. McMahon also stated that Plaintiff would need to do something with her hair so that "she could keep her job."

64.     From Plaintiff's review, no Amazon policy exists prohibiting women from wearing their natural hair under their bump caps.

65.     Mr. McMahon did not comment about the hair styles or hair texture of any of Plaintiff's Caucasian male counter parts.

iv.     ***Mr. McMahon's Disparate Treatment Towards Plaintiff: Timing of Rack Pulls***

66.     Despite Plaintiff timely arriving to work and reporting to her duty station, she was often chastised by Mr. McMahon for the actions of other team members.

67.     On or around July 17, 2020, Mr. McMahon chastised Plaintiff for failing to start rack pulls within 30 minutes of her arrival at work.

68.     Plaintiff's duties require 2 technicians in order for completion.

69.     As such, even where Plaintiff would arrive at a rack pull within 30 minutes of her work start time, she would have to wait for her partner to arrive before beginning her work.

70.     Despite being timely to work and reporting to her duty station, Mr. McMahon would routinely chastise Plaintiff for the actions of Chris Wills, Ryan Hughes and Shawn Maybush, Plaintiff's Caucasian male team members, who as a result of their late arrival to work would impede Plaintiff's ability to timely begin her rack pulls.

v.      ***Mr. McMahon's Disparate Treatment Towards Plaintiff: Defendant's Attendance Policy***

71.     Defendant's policies permit employees a 15-minute grace period after their work start time to arrive to work.

72.     Plaintiff would report to work within 15 minutes of her 8:00 a.m. work start time.

73.     Mr. McMahon however required Plaintiff to present to work at 8:00 a.m.

74.     Mr. McMahon allowed Plaintiff's Caucasian male co-workers to present to work well after 8:15 a.m. with no prior notice.

10

75.     Unlike Plaintiff, Plaintiff's Caucasian male co-workers did not receive any write ups nor were placed on a Pivot for their tardiness.

## STATEMENT OF CLAIMS

## COUNT I: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Disparate Treatment)

76.     Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth in full.

77.     Plaintiff is a member of a protected class and was subjected to disparate treatment because of her race and gender in violation of Title VII of the Civil Rights Act of 1964.

78.     Plaintiff was qualified for her position.

79.     Plaintiff suffered an adverse employment action when she was wrongfully terminated from her position with Defendant on the basis of race and sex.

80.     Defendant's violations entitle Plaintiff to all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, monetary losses sustained, an equal amount of liquidated damages, interest at the prevailing rate, and attorneys' fees and costs.

## COUNT II: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Retaliation)

81.     Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth in full.

82.     Plaintiff reported her manager's discriminatory behavior to Defendant which constituted protected activity.

83.     Defendant, through its agents, subjected Plaintiff to retaliation after she engaged in protected activity.

84.     As a result of Plaintiff's reports, her managers became increasingly aggressive towards Plaintiff and extoled a higher level of scrutiny towards her work.

85.     Defendant's violations entitle Plaintiff to all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, monetary losses sustained, an equal amount of liquidated damages, interest at the prevailing rate, and attorneys' fees and costs.

## COUNT III: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Hostile Work Environment)

86.     Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth in full.

87.     Plaintiff is a member of a protected class (African American and female) and was subject to unwelcome harassment.

88.     Defendant's harassment of Plaintiff was based on Plaintiff being African American and female and was severe and pervasive enough to create a hostile and abusive working environment.

89.     Defendant's violations entitle Plaintiff to all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, monetary losses sustained, an equal amount of liquidated damages, interest at the prevailing rate, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Jamie Carroll, requests the Court to issue the following relief:

A. Enter declaratory judgement that Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964 and declaring Plaintiff eligible to receive equitable and other relief; and,

B. Award Plaintiff compensatory and punitive damages for all the mentioned causes of action in an amount to be determined by a jury of her peers; and,

C. Award Plaintiff attorneys' fees, costs, and expenses of litigation; and,

D. Award such other relief to which Plaintiff may be entitled to under law.

## JURY DEMAND

Plaintiff demands a trial by jury for any and all issues proper to be so tried.


Respectfully submitted,

/s/ Alexander Taylor
Alexander Taylor,
Alex Taylor Law, PLC
1622 W Main St.
Richmond, VA 23220
Phone: (804) 239-9232
Fax: 866-446-6167
alextaylor@alextaylorlaw.com
*Counsel for Plaintiff*